THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

v.

YONATAN ASTACIO-MIESES,

Defendant.

Crim No. 23-028 (ADC)

## OPINION AND ORDER

I.    **Introduction**

On September 20, 2023, defendant Yonatan Astacio-Mieses ("defendant") filed a motion seeking to dismiss the one-count indictment against him based on the purported unconstitutionality of 18 U.S.C. § 922(g)(5).[1] **ECF No. 45**. This statute makes it unlawful for a noncitizen "illegally or unlawfully in the United States[,]… to… possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5)(A).[2] Defendant

---

[1] Although the parties repeatedly refer in their filings to Section 922(g)(5), the specific statutory provision at issue here is Section 922(g)(5)(A). Therefore, even if not specifically mentioned, this Opinion & Order should be read to refer only to Section 922(g)(5)(A).

[2] Whenever possible, this Opinion & Order uses the term "noncitizen" as equivalent to the statutory term "alien." *See*, *e.g.*, *Santos-Zacaria v. Garland*, 598 U.S. 411, 414 n. 1 (2023) and *Nasrallah v. Barr*, 590 U.S. 573, 578 n. 2 (2020). Accordingly, the term "noncitizen" should be taken to mean "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3); *see* 18 U.S.C. § 922(y)(1)(A) (applying definition to 18 U.S.C. § 922(g)(5)). However, because of the historical nature of the analysis done here, the Court will not always be able to uniformly adhere to this this terminology.

calls upon the Court to declare that by enacting Section 922(g)(5)(A), Congress infringed on the people's right to keep and bear arms protected by the Second Amendment.

Not too long ago, this Court had the opportunity to tackle this question in *United States v. Pierret-Mercedes*, No. 22-cr-430-ADC, --- F. Supp. 3d ---, 2024 WL 1672034 (D.P.R. Apr. 18, 2024). There, after a thorough review and analysis of the applicable authorities, the Court concluded that Section 922(g)(5)(A) survives constitutional scrutiny against a facial and as-applied challenge under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022). The arguments and authorities presented in that case by both the government and the defendant are virtually identical to those raised here, which would otherwise facilitate the resolution of the present motion. However, the Supreme Court recently issued an opinion in *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (2024), rejecting a facial challenge to a subsection of 28 U.S.C. § 922(g)(8) and, in the process, recalibrating (to an extent) the applicable Second Amendment test for examining the constitutionality of firearm regulations.

Accordingly, the Court has given independent consideration to defendant's arguments and incorporated *Rahimi* to its analysis. Nonetheless, the motion to dismiss suffers the same fate as the one in *Pierret-Mercedes*. For the reasons explained below, the Court **DENIES** defendant's motion to dismiss at **ECF No. 45**.

## II.   Factual and Procedural Background

Defendant was arrested by agents of the Puerto Rico Police Bureau ("PRPB") on January 18, 2023, during an operation to recover stolen property at a parking lot outside the shopping

mall Plaza Las Américas. *See* Affidavit attached to Criminal Complaint, **ECF No. 1-1**. PRPB agents found a loaded 9mm pistol and ammunition in a fanny pack dropped by defendant. *Id.*, at 2. After having received his Miranda warnings and waiving them in writing, defendant informed ATF agents the next day that he was a noncitizen illegally present in the United States and had been living in Puerto Rico for more than two years. *Id.*

On January 26, 2023, a grand jury returned an indictment charging him with possession of a firearm and ammunition by a noncitizen unlawfully present in the United States (18 U.S.C. § 922(g)(5)). **ECF No. 6**. The indictment charges defendant with possession of a firearm described as a Glock pistol, Model 19X, .9mm caliber, bearing serial number BHTW809, and a total of forty-six rounds of 9mm ammunition. *Id.*

In his motion to dismiss, defendant raises a facial challenge against the constitutionality of 18 U.S.C. § 922(g)(5). To do so, he relies primarily on the application of *Bruen*, where the Supreme Court mandated a "history and tradition" test for laws that regulate conduct purportedly protected by the Second Amendment. U.S. Const. amend II. Defendant puts forth two main arguments under *Bruen*. First, that noncitizens unlawfully present in the United States are part of "the people" that the text of the Second Amendment protects, making Section 922(g)(5) presumptively unconstitutional. **ECF No. 45** at 4-7 and 10-11. In support, he alleges that he is part of "the people" because he has resided in Puerto Rico for more than two years, maintained a relationship with a U.S. citizen in the island, and worked in construction. *Id.*, at 2,

7. Second, defendant posits that there is no longstanding history in the United States of disarming aliens, and thus Section 922(g)(5) is unconstitutional under *Bruen. Id.,* at 7-11.

The government, for its part, filed a response in opposition on October 16, 2023. **ECF No. 50**. There, the government argues that Section 922(g)(5) is a lawful regulatory measure on the right to keep and bear arms for three reasons. First, the government rejects defendant's contention that he is part of "the people" to whom the Second Amendment applies because, as a noncitizen unlawfully present in the United States, he is neither a "law-abiding citizen" nor a member of the "the political community." *Id.,* at 4-11. Second, that at the time of its ratification in 1791, the Second Amendment was understood to protect the citizens' right to keep and bear arms, but not that of persons who were not considered part of the political community, such as Native Americans, Catholics, and those who refused to swear oaths of allegiance. *Id.,* at 12-14. Third, that even if defendant were protected by the Second Amendment, Section 922(g)(5) would still be lawful as it is in keeping with the historical tradition of firearm regulations. *Id.,* at 14-19.

## III.    Legal Standard

When reviewing a defendant's motion to dismiss an indictment, the reviewing court "must not inquire into the sufficiency of the evidence underlying the indictment," rather, the court must consider "'whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)). In doing so, "courts take the facts

alleged in the indictment as true…" and "routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (citing *Guerrier*, 669 F.3d at 4). A "technically sufficient indictment handed down by a duly impaneled grand jury is enough to call for trial of the charge on the merits." *Id.* (citations omitted).

As to constitutional challenges, facial challenges are "the most difficult to mount successfully [because] the challenger must establish that no set of circumstances exist under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). If a court is able to identify a scenario in which the law could be validly applied, then the law survives the challenge. *See Rahimi*, 144 S. Ct. at 1889 ("[T]o prevail [on a facial challenge], the Government need only demonstrate that [the law] is constitutional in some of its applications. And here the provision is constitutional as applied to the facts of [the challenger's] own case.").

## IV.    Discussion

Over two hundred years after the ratification of the Bill of Rights, the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), first held that the Second Amendment protects an individual's right to keep and bear arms for self-defence. Two years later, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court incorporated this individual right, making it applicable to the states via the Fourteenth Amendment. In the years after *Heller* and *McDonald*, the First Circuit, as well as other federal circuit courts of appeal, devised and implemented a two-step test to evaluate the constitutionality of firearm regulations under the Second

Amendment. *See, e.g., Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018). Under this test, courts would first ask whether the challenged law burdens conduct that fell within the scope of the Second Amendment. "This [was] a backward-looking inquiry, which [sought] to determine whether the regulated conduct was understood to be within the scope of the right the time of ratification." *Id.*, at 669 (quotation marks omitted). If the conduct did indeed fall within the purview of the Second Amendment, the court would have to "determine what level of scrutiny [was] appropriate and… proceed to decide whether the challenged law survive[d]…." *Id.*

In 2022, the Supreme Court did away with this test in *Bruen*, explicitly forbidding the application of means-end scrutiny to firearm regulations under the Second Amendment. *See Bruen*, 597 U.S at 24. In its place, it announced a novel two-step test which purported to further refine the history and tradition analysis applied in *Heller*. Discussed in further detail below, *Bruen* essentially required courts to first determine whether the Second Amendment's plain text covered the regulated conduct, and if so, then whether the government could demonstrate that the regulation was consistent with the United States' historical tradition of firearm regulations. *Id.*, at 17.[3] This second step involved a nuanced historical evaluation of whether the challenged regulation addressed a longstanding societal problem that was treated in a specific manner at

---

[3] Although the Supreme Court's formulation of the first step focuses on the *conduct* purportedly covered by the Second Amendment, there is reason to believe that courts need also evaluate whether the individual challenging the regulation is included in "the people" and whether the firearm in question is covered by amendment's use of the term "arms". *Bruen*, 597 U.S. at 31-32 (examining whether the challengers were "part of 'the people' whom the Second Amendment protects" and establishing that "handguns are weapons 'in common use' today for self-defense" before turning to "whether the plain text of the Second Amendment" protected the regulated conduct.). *See also* discussion *infra*, Part IV.A.

the time the Second Amendment was ratified. If this longstanding societal problem was not regulated at all, was subject to unsuccessful regulation attempts, or was regulated but in a materially different way, then the modern regulation was unconstitutional. *Id.*, at 26-27. If, on the other hand, the regulation addressed "unprecedented societal concerns or dramatic technological changes," then the government could be afforded more leeway and could establish the constitutionality of the regulation by demonstrating the existence of sufficiently analogous historical regulations. *Id.*, at 27-29.

Most recently, and just two years after *Bruen*, the Supreme Court in *Rahimi* upheld the constitutionality of a subsection of 18 U.S.C. § 922(g)(8) that disarms persons against whom a court has issued a restraining order and has found that the person poses a credible threat to the physical safety of an intimate partner or child. *Rahimi*, 144 S. Ct. at 1896-97. In doing so, the Supreme Court admonished lower courts not to read *Heller* and *Bruen* as "suggest[ing] a law trapped in amber." *Id.*, at 1897. Dealing principally with *Bruen's* second step analysis, the Supreme Court further clarified that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," and thus:

> …the appropriate analysis involves considering **whether the challenged regulation is consistent with the principles that underpin our regulatory tradition**. A court must ascertain whether the new law is **relevantly similar** to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances.

*Id.*, at 1898 (emphasis added) (cleaned up). In sum, "[t]he law must comport with the principles underlying the Second Amendment…." *Id.*; *see also United States v. Langston*, 110 F.4th 408, 417-18 (1st Cir. 2024) (discussing *Rahimi*).

Taking note of the above, the Court proceeds to re-evaluate whether Section 922(g)(5)(A) survives constitutional scrutiny, beginning with applying the plain text of the Second Amendment to defendant's challenge.

### A. Whether the plain text of the Second Amendment covers defendant, his firearm, and his possession thereof.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The Court must first determine whether the regulated firearm (a handgun), conduct (possessing and carrying of firearms), and defendant (a noncitizen unlawfully present in the United States) are covered within the plain text of the Second Amendment.

In *Pierret-Mercedes*, this Court reviewed and accepted a Magistrate Judge's conclusion that both the conduct and the defendant were arguably covered by the Second Amendment. *Pierret-Mercedes*, at *5-6. Because neither party there argued as to whether the firearm in question was covered, the Court did not address that point. *Id.* But, as the Court there noted, a careful reading of *Bruen* evinces that both the firearm and the individual, in addition to the conduct, must fall under the amendment's plain text. *Id.*, at *5 n. 5. The Court therefore deems it proper to analyze all three elements: the firearm, the conduct, and the individual. *See, e.g., United States v. Alaniz*,

69 F. 4th 1124, 1128 (9th Cir. 2023) ("In alignment with *Heller*, [*Bruen*] requires a textual analysis, determining whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment.") (cleaned up).

### 1. Whether the handgun is protected.

Here, the firearm in question is a 9mm caliber Glock pistol. **ECF No. 6** at 1. Defendant was also found carrying a total of forty-six rounds of ammunition. *Id.* In *Heller*, the Supreme Court found that a handgun ban infringed on the Second Amendment, reasoning in part that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The Second Amendment protects the possession and carrying of arms that are "in common use today for self-defense." *Bruen*, 597 U.S. at 32 (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016)). The government does not address this issue and does not otherwise imply that the pistol or ammunition constitute anything other than "arms" protected by the Second Amendment. The Court will therefore move to the next step in the plain-text analysis.

### 2. Whether the individual is protected.

As to the individual, defendant alleges that he has been present in the United States for two years, has established ties to the community via a relationship with a United States citizen, and is employed in the construction industry. **ECF No. 45** at 2, 7. In other words, defendant

attempts to establish that he has laid down roots in this country, become part of the political community, and is therefore among "the people" whose rights the Second Amendment protects.

These factors may, to some degree, work in his favor in an as-applied challenge for purposes of determining whether he belongs to "the people" covered by the Second Amendment. However, defendant does not raise an as-applied challenge; he raises a facial one. That means that "to prevail, the Government need only demonstrate that [Section 922(g)(5)(A)] is constitutional in some of its applications." *Rahimi*, 144 S. Ct. at 1898. Here, the government takes a maximalist approach to argue that the Second Amendment only protects "citizens" who are "law-abiding." **ECF No. 50** at 5. But "holding that the right to keep and bear arms belongs only to the 'citizens' subset of 'the people' (and more precisely, only to the 'law-abiding, responsible' subset of 'citizens') would entail adopting an inconsistent reading of the word 'the people' across the Constitution." *Pierret-Mercedes*, 2024 WL 1672034, at *15 (citing *Verdugo-Urquidez*, 494 U.S. 259, 264-66 (1990) and *Huitrón-Guizar*, 678 F.3d 1164, 1167-69 (10th Cir. 2012)).

Neither the Supreme Court nor the First Circuit have authoritatively delineated who exactly is included in the Second Amendment's use of the term "the people," but other courts have taken the approach of assuming for purposes of analysis that at least some noncitizens unlawfully present in the United States are included. *See, e.g., United States v. Jiménez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022); *United States v. Pérez*, 6 F.4th 448, 453 (2d Cir. 2021); *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019); *Huitrón-Guizar*, 678 F.3d at 1169; *see also United States v. Vizcaíno-Peguero*, 671 F. Supp. 3d 124, 127-28 (D.P.R. 2023); *United States v. Trinidad-Nova*, 671

F. Supp. 3d 118, 121-22 (D.P.R. 2023); *United States v. DaSilva*, 21-CR-267, 2022 WL 17242870 (M.D. Pa. Nov. 23, 2022); *United States v. Leveille*, 18-cr-02945-WJ, 2023 WL 2386266 (D.N.M. Mar. 7, 2023).[4] The other side of that coin, however, is that the Second Amendment does not protect all noncitizens unlawfully present in the United States, which means that Section 922(g)(5)(A) does not infringe on the Second Amendment in at least some cases. This defeats defendants' facial challenge. *See Rahimi*, 144 S. Ct. at 1898; *see also United States v. Josue Alvarez*, No. CR H-20-297, 2024 WL 3166935, at *3 (S.D. Tex. June 25, 2024) ("At the very least some illegal aliens have not 'developed sufficient connection with this country to be considered part of the national community' and are therefore not included in the class of 'the people' protected by the Second Amendment.… For Defendant's facial challenge to succeed, every illegal alien would have to be part of 'the people.'").

Defendant raises a facial challenge, which means he must show "that no set of circumstances exist under with the [law] would be valid." *Salerno*, 481 U.S. at 745. But Section 922(g)(5)(A) could, under the Second Amendment, apply to those noncitizens unlawfully present in the United States who are not understood to be within "the people," even if that term were liberally construed to include some such noncitizens. Therefore, defendant's facial challenge against Section 922(g)(5)(A) fails.

---

[4] Even though *Jiménez-Shilon* and *Huitrón-Guizar* were resolved prior to *Bruen*, their historical analysis does not imply the type of means-end scrutiny that *Bruen* explicitly forbade, and, regardless, they continue to be persuasive authority.

### 3.  Whether the conduct is protected.

The Court could stop its analysis here and dispose of the motion to dismiss. However, as pointed out above, defendant sometimes highlights his specific circumstances to suggest that he is part of "the people" protected by the Second Amendment. *See* **ECF No. 45** at 2, 7 (proffering that defendant resided in Puerto Rico for two years before his arrest, maintained a relationship with a U.S. citizen, and had worked in construction; arguing that this makes him part of "the people" protected by the Second Amendment). Erring on the side of caution, lest a reviewing court construe this as raising an as-applied challenge, the Court will continue with its plain-text analysis.

With regards to the regulated conduct, Section 922(g)(5) regulates the mere possession of firearm. That conduct seemingly falls within the Second Amendment. But in truth, the Second Amendment does not protect all kinds and types of firearms possession. *See Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). *Heller* held that the possession of a handgun in the home for self-defense was protected conduct under the Second Amendment. *Heller*, 554 U.S. at 634. *Bruen* held that such protection extends outside of the home. *Bruen*, 597 U.S. at 10. Conduct falling outside this realm can be regulated without fear of infringing on the Second Amendment. In other words, a firearm possessed for a different purpose falls outside of its protection.

Here, defendant was arrested in possession of a firearm in a parking lot outside a shopping mall. Nowhere in the indictment, the motion to dismiss, or in any other part the record is there any inkling of an allegation that defendant possessed the firearm in public for purposes of self-defense. This omission may very well be fatal to his Second Amendment challenge (whether facial or construed as applied). *See United States v. Trinidad-Nova*, No. CR 21-398 (SCC), 2022 WL 10067519 (D.P.R. Oct. 17, 2022) (denying *Bruen* challenge in a motion to dismiss an indictment charging violation of 28 U.S.C. § 922(g)(1) in part because the movant failed to provide the Court with "sufficient factual allegations to hold that the who, what, and why at issue fall within the Second Amendment's scope.").[5]

But one question that *Heller*, *Bruen*, and now *Rahimi* leave open is whether there is any standing threshold that a criminal defendant must meet in order to raise a Second Amendment challenge. *See Pierret-Mercedes*, 2024 WL 1672034, at *7 (expanding on this and other open questions). Therefore, again erring on the side of caution, even though all signs point to defendant's challenge failing the plaint-text analysis, the Court will proceed to evaluate whether Section 922(g)(5)(A) fits within the United States' history and tradition of firearm regulations.

---

[5] The government included screenshots of text messages taken from a consented extraction of defendant's cellphone to imply that he was involved in drug trafficking and possessed the firearm and ammunition with unlawful intent. *See* **ECF No. 50** at 6-9. However, contrary to *Trinidad-Nova*, the government here did not charge defendant with possessing a firearm in furtherance of a drug trafficking crime. Defendant is charged only for being a noncitizen unlawfully in the United States in possession of a firearm. For that reason, even assuming that these images could be considered at this stage, the Court is not inclined to treat the government's factual proffer as indicative of an unlawful purpose.

**B. Whether the government can demonstrate that Section 922(g)(5)(A) is consistent with the principles of the Second Amendment.**

Even if the Court assumes that defendant's challenge somehow surpasses the plain-text analysis, the Court would nonetheless deny it because Section 922(g)(5)(A) is sufficiently analogous to relevantly similar historical firearm regulations.

Section 922(g)(5)(A) seeks to address the general problem of the possession of firearms by persons deemed by Congress to be too dangerous to the security of the community and the state. *See Pierret-Mercedes*, 2024 WL 1672034, at *9-12 (canvassing the history of the prohibited person federal statutes).[6] The government points to three types of historical regulations from

---

[6] In *Pierret-Mercedes*, the Court undertook this exercise to better ascertain the level of generality by which it was to conduct the history and tradition analysis:

> [T]he Court will first determine whether Section 922(g)(5)(A) addresses a "general societal problem" that has persisted since the 18th century or if it is one of more recent vintage. To do so, the Court will begin with the "how" and "why" of Section 922(g)(5)(A) and then compare it to the "how" and "why" of statutes that form part of the historical tradition of firearm regulations in the United States.

*Pierret-Mercedes*, 2024 WL 1672034, at *8. That was because *Bruen* implied that there was a clear demarcation in the inquiry to be performed between instances where examples of "distinctly similar" statutes would be required and those where only "relevantly similar" analogues would suffice. *See id.*, at *12-14 (analyzing whether "illegal immigration" was a "general societal problem persistent since the 18th century" and concluding that it was not, allowing for the government to proceed to justify Section 922(g)(5)(A)'s constitutionality through analogy to "relevantly similar" historical statutes). In *Rahimi*, issued after this Court decided *Pierret-Mercedes*, the Supreme Court seems to have either done away *sub silentio* with the "distinctly similar" standard in favor of the "relevantly similar" one, or, at least, watered down any bright line distinction between them:

> [S]ome courts have misunderstood the methodology of our recent Second Amendment precedents…. As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition…. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances.

the time of the Founding Era that had similar justifications and placed similar burdens on the

right to keep and bear arms: laws that disarmed persons who were not considered part of the

political community, such as Native Americans, Catholics, and those who refused to swear oaths

of allegiance. *See* **ECF No. 50** at 14-19. In *Pierret-Mercedes*, this Court carefully analyzed

numerous historical examples of such regulations (and others) and concluded:

> These Founding Era statutes are reflective of a concern among the Framers and
> their immediate predecessors that allowing firearms in the hands of specific
> classes of persons was dangerous to the integrity of the political community. Both
> Catholics in the colonial era as well as Native Americans up to and through
> ratification were considered "dangerous" on the basis that the[y] posed a threat to
> the state. This same idea motivated the allegiance statutes enacted during the
> Revolutionary War and in the decade after, aimed at those who could not be
> trusted to support the nascent state governments. In all, within the larger subset
> of dangerous persons, they represented a particular danger because of [ ] their
> perceived lack of loyalty to the government. The Second Amendment, as
> understood by the Framers in 1791, thus likely allowed the regulation of the
> possession of firearms by these types of persons, as they were outside of what was

---

*Rahimi*, 144 S. Ct. at 1897-98 (cleaned up); *see also Pierret-Mercedes*, 2024 WL 1672034, at *8 ("Rather than being an 'either-or' standard, the Court understands *Bruen's* step two to be a holistic one."). Indeed, the courts must now analogize to "principles" rather than fixating on comparing the specific aspects of the statute. "Discerning and developing the law in this way is 'a commonplace task for any lawyer or judge.'" *Rahimi*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 28). That much is evident from the majority opinion, authored by Chief Justice Roberts and joined by all but Justice Thomas, the author of *Bruen*. *See id.* ("…the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."). Justice Sotomayor, joined by Justice Kagan, recognized this change in emphasis. *Id.*, at 1904 (Sotomayor, J, concurring) ("The Court's opinion also clarifies an important methodological point that bears repeating: Rather than asking whether a present-day gun regulation has a precise historical analogue, courts applying *Bruen* should 'consider whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition.") (cleaned up). Justice Barret likewise expressed support for this necessary shift. *Id.*, at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). And Justice Jackson lent her approval to the revised approach. *Id.*, at 1929 (Jackson, J., concurring) (highlighting that the majority opinion "underscor[es] that gun regulations need only comport with the *principles* underlying the Second Amendment."). This is a welcome, albeit incomplete, respite from the many difficulties that the *Bruen* framework imposed on the lower courts, much of which *Rahimi* leaves unaddressed. *See Pierret-Mercedes*, 2024 WL 1672034, at *24-26 (describing burdens); *see also, generally, Rahimi*, 144 S. Ct. at 1927-30 (Jackson, J., concurring) (same).

considered the political community at the time despite their physical presence in the national territory.

*Pierret-Mercedes*, 2024 WL 1672034, at *21.[7] Finding that the justification underlying these disarmament statutes were analogous enough to that which motivated Congress to enact Section 922(g)(5)(A), the Court concluded that the statute was consistent with the United States' historical tradition of firearm regulations. *Id.*, at *22. The Court sees no reasons to conclude otherwise here.

**V.       Conclusion**

As explained above, even if the plaint text of the Second Amendment were to protect defendant and his conduct—which in the Court's view, it does not—Section 922(g)(5)(A) still survives constitutional scrutiny as it is a good fit within the United States' historical tradition of firearm regulations. Defendant's constitutional challenge to the statute fails, whether considered a facial or an as-applied challenge. The motion to dismiss at **ECF No. 45** is, accordingly, **DENIED**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 26th day of September 2024.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**

---

[7] The Court reached this result through a ponderous analysis of a number of English, colonial, and early Founding Era statutes with reference to primary sources. *Pierret-Mercedes*, 2024 WL 1672034, at *14-22. The Court considers its analysis in *Pierret-Mercedes* to be sufficiently complete and sees no need to textually reproduce it here when a citation suffices to incorporate it to this Opinion & Order.